UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**CURTIS E. BLACKWELL, II,**

      Plaintiff,

                                          Case No.  18-cv-
                                          Hon.

v

**LOU ANNA K. SIMON**, in her individual
capacity as president of Michigan State University,
**MARK DANTONIO**, in his individual capacity
as Head Football Coach of Michigan State
University, **MARK HOLLIS**, in his individual
capacity as Director of Intercollegiate Athletics for
Michigan State University, **DETECTIVE CHAD
DAVIS**, in his individual capacity as a detective
for the Michigan State University Police
Department, and **DETECTIVE SAM MILLER**,
in his individual capacity as a detective for the
Michigan State University Police Department;

      Defendants.

| | |
|---|---|
| James K. Fett (P39461)<br>FETT & FIELDS, P.C.<br>Attorney for Plaintiff<br>805 E. Main<br>Pinckney, MI  48169<br>734-954-0100<br>734-954-0762-fax<br>jim@fettlaw.com<br>Attorneys for Plaintiff | |

# COMPLAINT AND DEMAND FOR JURY TRIAL

PLAINTIFF, CURTIS BLACKWELL, II (**"Plaintiff"**) through counsel, states the

following complaint against Defendants:

## NATURE OF PLAINTIFF'S CLAIMS

1.      This lawsuit has been filed because certain Michigan State University ("MSU") officials, feeling the heat from the Larry Nassar cover-up, and eager to prove they were tough on cover-ups, ran roughshod over Plaintiff's rights when he was wrongly accused of covering up for MSU athletes involved in an alleged sexual assault of a female co-ed in January 2017.

2.      With no evidence, none, that Plaintiff covered up for the athletes, the MSU Police Department, in stormtrooper fashion cuffed Plaintiff, seized his personal and MSU cell phones and hauled him off to the MSU Police station.

3.      No charges were ever filed against Plaintiff and the County Prosecutor acknowledged in Court filings that Plaintiff committed no crime.

4.      It is not surprising then that after being hauled off to jail for no good reason amid the Nassar hysteria that he exercised his Fifth Amendment right to remain silent when:

   (1)      the MSU Police Department, for no good reason, wrongly arrested him and seized his cell phones and demanded an in-custody interrogation;

   (2)      during the pendency of unfounded criminal charges, MSU demanded that he submit to another interrogation by its lawyers.

5.      Afraid for their own hides, these MSU defendants swiftly retaliated against Plaintiff for doing what any reasonable person in his position would have done.

6.      First, they suspended him in violation of his Employment Agreement and then fired him after fabricating explanations to justify and divert attention away from their own actions and inactions.

7.      Never, not once, did these MSU defendants favor Plaintiff with the opportunity to sit down and explain his side of the story as required by the Employment Agreement.  **(Exhibit A)**

8.      Had they, Plaintiff would have explained that he did not provide cover for the student athletes or interfere with an investigation; rather, he was simply performing his job which required "mentoring student athletes".

9.      Plaintiff asserts constitutional claims for the false arrest and imprisonment and subsequent termination.

10.     Plaintiff's claims are brought pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201, *et. seq.*

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over Plaintiff's claims pursuant to 42 U.S.C. 1983; 28 U.S.C. §§ 1331, 1332, 1337, 1343, and 1367.

12.     This Court also has jurisdiction to render a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*

13.     Venue is proper under 28 U.S.C. § 1391(b)(1) because upon information and belief, all of the named Defendants reside in the State of Michigan, and in the Western District of Michigan.

## PARTIES

14.     Plaintiff is a resident of Wayne County, Michigan.

15.     Plaintiff is co-founder and President of Sound Mind Sound Body Foundation, a Michigan nonprofit corporation.

16.     Defendant, Lou Anna K. Simon (**"Defendant Simon"**), is the former president of MSU.

17.     Defendant, Mark Dantonio (**"Defendant Dantonio"**), is the exceptional MSU Head Football Coach.

18.     Defendant, Mark J. Hollis (**"Defendant Hollis"**), is the former MSU Athletic Director.

19.     Defendant, Chad Davis (**"Defendant Davis"**), is a detective with the MSU Police Department.

20.     Defendant, Sam Miller (**"Defendant Miller"**), is a detective with the MSU Police Department.

21.     Defendants Davis and Miller are also collectively referred to as the "MSU police defendants".

## COMMON ALLEGATIONS

### Defendant Dantonio's Recruitment of Plaintiff to Join MSU Football Staff

22.     Since 2004, Plaintiff has worked diligently through his foundation to assist young student athletes with the difficult task of obtaining college scholarships; this is done in part by showcasing young talent at an annual foundation football camp attended by many college football coaches.

23.     In the summer of 2013, Defendant Dantonio attended Plaintiff's annual football camp at Southfield High.

24.     Plaintiff working through his foundation, caught the eye of Defendant Dantonio in the summer of 2013.

25.     During his visit to Plaintiff's Sound Mind Sound Body football camp, Defendant Dantonio offered Plaintiff a job on the MSU football staff.

26.     The position required Plaintiff to incorporate aspects of his Sound Mind Sound Body football camp into MSU's football program.

27.     Plaintiff accepted Defendant Dantonio's offer of the newly created position titled Director of College Advancement and Performance/Camp Director ("Director"); the contract for the position would be renewable from year-to-year at Defendant Dantonio's discretion.

28.     On July 31, 2013, Defendant Hollis, on behalf of MSU, and Plaintiff signed the initial one-year contract for Plaintiff to serve in the Director position.

## Plaintiff's Exemplary Performance

29.     Defendants Dantonio and Hollis renewed Plaintiff's contract each year from 2013 through March 31, 2017.

30.     Each year that Defendants Dantonio and Hollis renewed Plaintiff's contract, they raised his salary.

31.     Because Plaintiff was so successful in his position and had received glowing evaluations from his peers, in March 2016, Defendants Dantonio and Hollis significantly increased Plaintiff's salary from $83,435 to 129,000.

32.     Defendants Dantonio and Hollis also significantly increased Plaintiff's salary because a competing Big Ten football program in Ann Arbor, Michigan made Plaintiff a lucrative offer to join its program in a similar position that would have paid Plaintiff nearly twice the compensation that Plaintiff earned at MSU.

33.     Defendants provided the following explanation for the raise:

> With Curtis on staff, we have attracted high-level recruits, which in turn supports the success of our football program. This success is evident in the winning record over the past few years. If Curtis were to leave, he would take his recruiting strategies and recruiting relationships with him to another school. This would impact the recruiting success of the program and it would be leveraged at another Big Ten school/competitor.

34.     Consequently, Defendants Dantonio and Hollis believed it was in the best interest of the MSU football program to raise Plaintiff's salary by $45,000 in 2016.

5

35.     During his tenure as Director, Plaintiff always received glowing and exceptional evaluations, which is why Defendants Dantonio and Hollis always renewed Plaintiff Blackwell's year-to-year contract.

36.     During his tenure as Director, Plaintiff was never disciplined or suspended by the Defendants Dantonio and/or Hollis.

## Players Sexual Assault Incident and Subsequent Police Interview and Unlawful Arrest of Plaintiff

37.     On January 15, 2017 an alleged sexual assault involving 3 MSU football players occurred at an off-campus party.

38.     One of the player's father contacted Plaintiff to inform him that he heard of a wild off-campus party his son and other freshmen had attended and asked Plaintiff to inquire if anyone was in trouble.

39.     Plaintiff inquired of several players, including one, Auston Robertson, that told him he had already spoken with Defendant Dantonio who had directed him to contact the Title IX Office to report a potential sexual assault incident.

40.     Plaintiff's inquiry of Auston Robertson and other players was limited to whether they got into any trouble at the party; they all said "no".

41.     No player acknowledged committing a crime or any sort of sexual contact.

42.     Plaintiff also informed Robertson that "if you didn't do anything, you know, why are you concerned?  You know, just go in there and tell the truth."

43.     At no time did Plaintiff conduct an investigation into what had occurred at the January 15th party; rather, he was simply "mentoring the student athletes" by encouraging them to stay away from wild parties.

44.     Plaintiff's actions were at all times consistent with his responsibility (per his Employment Agreement) **(Exhibit A)** to mentor the student athletes and that is what he did on January 16, 2017.

45.     On February 8, 2017, at approximately 9:15 a.m., Defendants Detectives Davis and Miller went unannounced to the MSU football building to interview at least four (4) football coaches, including Plaintiff, about an alleged sexual assault involving MSU football players that occurred on January 15, 2017.

46.     According to Defendant Miller's case report, at the time of the February 8, 2017 interviews, "it was believed all four coaches obtained information related to this incident/investigation[.]"

47.     Defendants Miller and Davis interviewed Plaintiff in his MSU football building office.

48.     Plaintiff cooperated fully during the course of the interview, answering truthfully all of the questions posed by Defendants Miller and Davis about the suspected players and what he knew about the alleged incident.

49.     Unexpectedly, and for no good reason, Defendants Miller and Davis stopped the interview, and without first reading Plaintiff his Miranda rights, unlawfully placed him under arrest for allegedly interfering and/or obstructing a criminal investigation, seized two cell phones, and then escorted Plaintiff out of his office to the parking lot.

50.     At the request of Defendants Miller and Davis, Officer Cody Kovacic immediately responded to the MSU football building and without first reading Plaintiff his Miranda rights, placed him in handcuffs and transported him to the MSU Police Department.

51.     Upon arrival at the MSU Police Department, Kovacic placed Plaintiff in an interview room, where Defendants Miller and Davis then read Plaintiff his Miranda rights from the MSU Police Department's advice of rights form.

52.     Upon being advised by Defendants Miller and Davis that he was being arrested for allegedly violating a "university ordinance", Plaintiff wisely invoked his Fifth Amendment constitutional right and chose not to speak further with Defendants Miller and Davis.

53.     The MSU Police Defendants released Plaintiff from police custody after approximately 30 minutes.

## Plaintiff's Unwarranted Suspension and Subsequent Nonrenewal of his Employment Contract.

54.     Upon release from police custody, Plaintiff immediately informed Defendant Dantonio of the unlawful arrest and detention.

55.     The next day, Defendant Dantonio advised Plaintiff that he was immediately suspended and on paid administrative leave and he was not to have any further contact with the football program or its players pending the outcome of the investigation.

56.     Suspiciously, almost instantly the media learned of Plaintiff's unlawful arrest and began writing defamatory stories about Plaintiff and his alleged involvement in the players sexual assault incident.

57.     At no time did Defendants honor Plaintiff's Employment Agreement which required that he be "provided with an opportunity to speak with the Athletic Director [Defendant Hollis] ... [p]rior to the imposition of any discipline or corrective action."

58.     Meanwhile, shortly after Plaintiff's unlawful arrest and false imprisonment, MSU in February 2017, commissioned an external investigation of the football program and the January 2017 alleged sexual assault incident involving MSU football players.

59.    Due to the illegal and unwarranted arrest and false imprisonment by the MSU Police Department, the pending criminal investigations by the MSU Police Department and the Ingham County Prosecutor, and the advice of his legal counsel, Plaintiff respectfully invoked his Fifth Amendment right and declined to be interviewed by investigators from the Jones Day law firm about the January 2017 sexual assault incident.

60.    The backdrop for this newest MSU scandal was the Larry Nassar sexual abuse investigation which revealed the MSU officials to be less than proactive in protecting the rights of sexual abuse victims; consequently, Defendants Simon, Hollis and Dantonio were eager to trammel the rights of Plaintiff to demonstrate their newfound commitment to protecting the rights of sexual abuse victims.

61.    Unfortunately, in law as in life, "two wrongs don't make a right"; Defendants were not privileged to run roughshod over Plaintiff's rights to make up for their lapses in the Nassar debacle.

62.    Plaintiff's invocation of his Fifth Amendment right, both with respect to the MSU Police and Jones Day interviews, greatly displeased MSU officials, including but not limited to Defendants Simon, Dantonio and Hollis, even though such invocation was prudent given the bad faith demonstrated by the illegal false arrest and false imprisonment, illegal seizure of his cell phones and subsequent violation of his Employment Agreement and defamatory media coverage apparently instigated by MSU officials.

63.    On information and belief, a regent petitioned Defendant Simon to spare Plaintiff, but she refused because the heat was on from the Nassar scandal; similarly, Defendant Hollis stated to a media representative that were it not for the Nassar scandal, Plaintiff would not have been treated so poorly.

64.    Before the expiration of Plaintiff's contract on March 31, MSU extended the contract on a month-to-month basis pending the outcome of the investigation; the contract was extended twice, once for the period April 1, 2017 to April 30, 2017 and again for the period May 1, 2017 to May 31, 2017.

## Defendants Retaliate Against Plaintiff For Not Speaking To The MSU Police and the Jones Day Law Firm By Terminating His Contract.

65.    During the week of May 22, 2017, Defendant Dantonio advised Plaintiff that he "had to move in  a different direction with the position", or words to that effect, and that he would not be renewing Plaintiff's Director contract; he later offered varying explanations for the adverse employment action.

66.    For example, on May 22, 2017, Kristine Zayko, who at the time was the MSU Deputy General Counsel, sent an email to Plaintiff's counsel advising him that:

> the following is excerpted from the notice University intends to send to Mr. Blackwell regarding the expiration of his fixed term contract MSU: 'Over the last several months, a staffing review has been conducted within the football program.  Based on feedback received during that review, as well as concerns that have arisen regarding your job performance, Coach Dantonio has determined that your contract should not be extended.'

67.    Then the next day, on May 23, 2017, Ms. Zayko sent another email to Plaintiff's counsel advising him that:

> the relevant text from the intended notice to your client will now read: "Over the last several months, a staffing review has been conducted within the football program. Based on feedback received during that review, as well as concerns regarding a potential conflict of interest with your outside activities, Coach Dantonio has determined that his program will move in a different direction and your contract will not be extended."

68.     However, despite the wording offered by MSU's legal counsel, the reason provided in the "official" May 24, 2017 notice of non-renewal did not include any of the wording offered in the May 22 & 23, 2017 emails.

69.     Rather, the reason stated in the "official" May 24, 2017 notice to Plaintiff was that "[a]s Coach Dantonio discussed with you earlier this week, he has determined that his program will move in a different direction and your contract will not be extended."

70.     Defendant Dantonio later stated to the media that Plaintiff's Employment Agreement was not renewed because of "philosophical differences" and not any possible MSU policy violations found by the Jones Day investigators.

71.     As set forth above, Plaintiff never violated MSU policy prohibitions against staff conducting investigations into sexual assault incidents; Plaintiff merely inquired if the players got into any trouble at the January 15, 2017 party.

72.     Defendants Simon, Dantonio and Hollis' retaliation against the Plaintiff for exercising his Fifth Amendment Right not to be interviewed by the MSU Police Defendants and Jones Day attorneys has severely damaged Plaintiff's reputation and good name.

## COUNT I

## Violation of Fourth Amendment Right To Be Free From Unlawful Arrest And Seizure by Davis and Miller

73.     Plaintiff incorporates by reference the preceding allegations.

74.     Defendants Davis and Milled did not have probable cause to arrest Plaintiff on February 8, 2017.

75.     The Fourth Amendment states in pertinent part that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV.

76.     A "seizure" of an individual takes place when, by means of physical force or a show of authority, his freedom of movement is restrained.

77.     Here, Plaintiff and his cell phones were "seized" within the meaning of the Fourth Amendment when Defendants Miller and Davis seized his cell phones and caused Plaintiff to be handcuffed, placed inside a locked police vehicle, and driven to the MSU Police Department.

78.     The MSU Police defendants lacked probable cause to arrest Plaintiff because there were no facts or circumstances that would cause a reasonably prudent person to believe that Plaintiff had committed a crime.

79.     There was no evidence that Plaintiff had interfered with a police investigation as the MSU Police Defendants had falsely alleged.

80.     Consequently, **no charges** were ever brought against Plaintiff by the Ingham County Prosecutor and the 54-B District court for the City of East Lansing granted Plaintiff complete immunity in exchange for his truthful testimony in the investigation of the January 2017 sexual assault incident.

81.     Moreover, the Ingham County Prosecutor's office has stated in its court filings that Plaintiff was "not a target or a subject of the ongoing criminal sexual conduct investigation" and Plaintiff "has no potential criminal liability in regards to that offense."

82.     After Plaintiff provided nearly three hours of subpoenaed testimony to the Prosecutor and the MSU Defendants on May 13, 2017, the Prosecutor's Office informed Plaintiff's

counsel that Plaintiff would not even be called as a witness if charges were issued against the former MSU football players. **(Exhibit B)**

83.     The MSU Police Department has concealed evidence by denying a lawful Freedom of Information Act request despite providing a heavily redacted police report in 2017.  **(Exhibit C)**

84.     The totality of the evidence establishes that the MSU Police Defendants did not have probable cause to arrest Plaintiff on February 8, 2018.

85.     The MSU Police Defendants' unlawful actions have severely damaged Plaintiff's reputation and good name.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants Miller and Davis as follows:

a.     Compensatory damages in whatever amount above $75,000.00 he is found to be entitled;

b.     An award of lost wages and the value of fringe benefits, past and future;

c.     An award of exemplary and punitive damages;

d.     An award of interest, costs and reasonable attorney fees under 42 USC §1988;

e.     A declaration that the Defendants Miller and Davis violated Plaintiff Fourth Amendment right against unlawful arrests and seizures; and

f.     An order awarding whatever other equitable relief appears appropriate at the time of final judgment.

## COUNT II

86.     Plaintiff incorporates by reference the preceding allegations.

87.     Plaintiff had the right under the Fifth Amendment to decline interrogation by the MSU police defendants and the Jones Day attorneys.

88.     Plaintiff wisely exercised that right given:

    a.     the unlawful nature of the arrest, seizure of his cell phones and subsequent false imprisonment;

    b.     the retaliatory suspension in violation of his Employment Agreement immediately after he exercised his Fifth Amendment right with the MSU Police Defendants; and

    c.     the subsequent defamatory media coverage apparently instigated by MSU officials.

89.     Plaintiff's exercise of his Fifth Amendment Right to decline interrogation by the MSU Police Department defendants as well as the Jones Day lawyers, was a significant, if not the sole, motivating factor in Defendant Simon's, Dantonio's and Hollis' decision not to renew Plaintiff's Employment Agreement.

90.     Defendant Dantonio's inconsistent explanations for failing to renew Plaintiff's contract establishes that the official explanation is pretextual.

91.     Defendants Simon's, Dantonio's and Hollis' decision to terminate Plaintiff's employment has caused him to sustain economic and non-economic damages that will continue into the foreseeable future.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants Simon, Dantonio and Hollis as follows:

    a.     Compensatory damages in whatever amount above $75,000.00 he is found to be entitled;

    b.     an award of lost wages and the value of fringe benefits, past and future;

    c.     An award of exemplary and punitive damages;

    d.     An award of interest, costs and reasonable attorney fees under 42 USC §1988;

    e.     A declaration that the Defendants Simon, Dantonio and Hollis retaliated against the Plaintiff for exercising his Fifth Amendment Right not to speak

to the MSU Police Department and to the investigators from Jones Day law firm; and

    f.    An order awarding whatever other equitable relief appears appropriate at the time of final judgment.

        Respectfully submitted,

        */s/ James K. Fett*
        By:  James K. Fett (P39461)
        Fett & Fields, P.C.
        805 E. Main St.
        Pinckney, MI  48169
        734-954-0100
        jim@fettlaw.com

Dated:  October 12, 2018    Attorney for Plaintiff

# JURY DEMAND

Plaintiff through counsel demands a jury trial on all issues triable to a jury.

        Respectfully submitted,

        */s/ James K. Fett*
        By:  James K. Fett (P39461)
        Fett & Fields, P.C.
        805 E. Main St.
        Pinckney, MI  48169
        734-954-0100
        jim@fettlaw.com

Dated:  October 12, 2018    Attorney for Plaintiff